# UNITED STATES DISTRICT COURT

for the

Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. MJ20-095
Target Residence 3 and Target Vehicle 2, more fully )
described in Attachments A1-A2 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Target Residence 3 and Target Vehicle 2, more fully described in Attachments A1-A2

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C §§ 841(a)(1) & 846 | Possession and Distribution of Controlled Substances |

The application is based on these facts:

✓ See Affidavit of Special Agent Eric Rodenberg, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Eric Rodenberg, DEA Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____02/27/2020_____

_____
*Judge's signature*

City and state: Tacoma, Washington

David W. Christel, United States Magistrate Judge
*Printed name and title*

STATE OF WASHINGTON      )
                         )          ss
COUNTY OF KING           )

## AFFIDAVIT

I, Eric Rodenberg, a Special Agent with the Drug Enforcement Administration, United States Department of Justice, being first duly sworn on oath, depose and state as follows:

## AFFIANT BACKGROUND

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration ("DEA"), and have been so employed since August 2019.  I am currently assigned to the DEA Seattle Field Division, Tacoma Resident Office.

3.      I received 16 weeks of specialized drug law enforcement training at the DEA training academy in Quantico, Virginia, from August 2019 to December 2019.  The training curriculum covered all aspects of drug investigations, including identification of controlled substances, physical and electronic surveillance, utilization of confidential sources, interview techniques, undercover operations, financial investigations, and the general operation of drug trafficking organizations.

4.      While working as a Special Agent, I have been involved in the investigation of individuals and organizations involved in the manufacture, transportation and distribution of controlled substances.  I have participated in the execution of search warrants for violations of federal and state drug laws.  I have conducted surveillance operations and have become familiar with the methods used by individuals engaged in the manufacture, transportation and distribution of controlled substances.  I have also consulted with other Special Agents that have monitored informant conversations with

AFFIDAVIT OF SA ERIC RODENBERG – 1
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

drug traffickers, and have monitored drug-related conversations between drug traffickers as part of court-authorized interception of wire communications.  In light of the foregoing, I am familiar with the manner in which illegal drugs are manufactured, transported, stored, and distributed; the methods of payment for such drugs; and the methods of laundering of drug proceeds.

5.      Prior to working for the DEA, I was employed with the Kent Police Department in Kent, Washington.  I was assigned to the patrol division from June 2018 to August 2019.  While working at Kent PD, I came in contact with individuals using and selling drugs on a daily basis.  I became familiar with the different tactics used to conceal drugs as well as the different methods used to transport and speak about drugs.

6.      Prior to working with the Kent Police Department, I was employed with the Missouri State Highway Patrol ("MSHP") from July 2013 to May 2018.  While working with the MSHP I received over 1,400 hours of specialized law enforcement training at the MSHP training academy.  The curriculum covered subjects such as investigative skills, interview and interrogation techniques, enforcement of various laws, building searches, firearms marksmanship, and physical training.  Following the academy, I enrolled in the Drug Recognition Expert ("DRE") program, and was trained to identify drugs and the physical symptoms associated with their use.

## PURPOSE OF AFFIDAVIT

7.      This affidavit is submitted in support of an application pursuant to Federal Rule of Criminal Procedure 41 for a search warrant to search the following:

a.      **Target Residence 3**: 3703 Auburn Way S., Apartment G-101, Auburn, Washington, 98092, as more fully set forth in Attachment A-1, which is incorporated herein by reference.

b.      **Target Vehicle 2**:  One green Dodge Magnum with white racing stripes on its back, Washington license BPB0137, as more fully set forth in Attachment A-2, which is incorporated herein by reference.

AFFIDAVIT OF SA ERIC RODENBERG – 2
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8.      As set forth below, I submit that there is probable cause to believe that the aforementioned locations and conveyance will contain or possess evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 distribution and possession with intent to distribute controlled substances, and conspiracy to commit these offenses).  I seek authorization to search and seize items specified in Attachment B, which is incorporated herein by reference.

## SOURCES OF INFORMATION

9.      During the course of this investigation, agents have received information from a confidential source ("CS"), as set forth below.

10.      The CS has been providing information and assistance to the DEA since 2015.  The CS has a criminal history consisting of one felony burglary conviction from 2012, and two felony drug trafficking arrests (2006 and 2008), where no charges were filed.  The CS is currently providing information and assistance to the DEA in exchange for monetary compensation and immigration benefits.

11.      Since 2015, the CS has provided reliable information and assistance to the DEA in numerous drug trafficking investigations.  The CS has conducted more than 20 controlled drug purchases and provided information that was proven reliable and led to the arrest and convictions of numerous drug traffickers.  The CS is familiar with the appearance of methamphetamine, cocaine, and heroin, and the way they are packaged, transported and sold.

## PROBABLE CAUSE

12.      Agents of the DEA Tacoma Resident Office ("DEA TRO") are conducting a drug-trafficking investigation.  Julian GUTIERREZ-PONCE and Juan Jose VEGA-FLORES have been identified as traffickers of methamphetamine and suspected fentanyl pills.  The following paragraphs describe the identification of GUTIERREZ-PONCE and VEGA-FLORES and their respective residences, as well as controlled purchases conducted during this investigation.

AFFIDAVIT OF SA ERIC RODENBERG – 3
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

13.     The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.  When the statements of others are set forth in this affidavit, they are set forth in substance and in part.

**A. Sources of Information**

14.     During the course of this investigation, agents have received information from a confidential source ("CS"), as set forth below.

15.     The CS has been providing information and assistance to the DEA since 2015.  The CS has a criminal history consisting of one felony burglary conviction from 2012, and two felony drug trafficking arrests (2006 and 2008), where no charges were filed.  The CS is currently providing information and assistance to the DEA in exchange for monetary compensation and immigration benefits.

16.     Since 2015, the CS has provided reliable information and assistance to the DEA in numerous drug trafficking investigations.  The CS has conducted more than 20 controlled drug purchases and provided information that was proven reliable and led to the arrest and convictions of numerous drug traffickers.  The CS is familiar with the appearance of methamphetamine, cocaine, and heroin, and the way they are packaged, transported and sold.

///

///

///

AFFIDAVIT OF SA ERIC RODENBERG – 4
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B. Controlled Purchase of Methamphetamine in November 2019**

17.     On November 1, 2019,[1] the CS reported to DEA TRO agents that s/he was communicating telephonically with an unidentified male ("UM1"), who was using a Mexican telephone number.  The CS reported that UM1 is a methamphetamine trafficker who was offering to sell multi-kilogram quantities of methamphetamine to the CS in the Seattle, Washington area.

18.     On the same date, at the direction of Special Agent ("SA") Jared Gibb, the CS attempted to call UM1 several times, but the calls were unanswered.  A short time later, the CS received a call from a second unidentified male ("UM2").  SA Gibb, who is fluent in Spanish, monitored and recorded the call.[2]  During the call, the CS spoke in Spanish with UM2 and arranged to meet UM2 the following week in the Seattle/Tacoma area to get a sample of methamphetamine.

19.     On November 4, 2019, at 12:13 p.m., at the direction of agents, the CS called UM2 to arrange the "sample meeting."  The call was not answered.  At 12:39 p.m., the CS received an incoming call from UM2.  During the call, which SA Gibb monitored and recorded, the CS spoke with UM2 and arranged to meet UM2 at the Tacoma Mall, located at 4502 S. Steele Street, Tacoma, Washington.  UM2 agreed to bring a sample of methamphetamine to the CS at that location.  At 1:20 p.m., agents established surveillance in the parking lot of the Tacoma Mall.

20.     At 1:32 p.m., SA Gibb and Task Force Officer ("TFO") Robert Shaw met with the CS at a predetermined location near the Tacoma Mall.  SA Gibb and TFO Shaw searched the CS's person and vehicle for contraband, with none found.  SA Gibb outfitted the CS with an audio/video recording/transmitting device.  At 1:36 p.m., the CS

---

[1] Unless otherwise noted, all dates and times described herein are approximate.

[2] All of the recorded telephone calls and text messages referenced in this Affidavit occurred in Spanish and were reviewed and translated by SA Gibb.

AFFIDAVIT OF SA ERIC RODENBERG – 5
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  placed a monitored/recorded call to UM2.  During the call, the CS and UM2 confirmed

2  that they would meet in about 10 minutes at the Tacoma Mall.

3     21.    At 1:43 p.m., at the direction of SA Gibb and TFO Shaw, the CS drove to

4  and parked in the parking lot of the Tacoma Mall.  Constant surveillance was maintained

5  on the CS during the operation.  At 1:53 p.m., the CS placed a call to UM2 that SA Gibb

6  monitored and recorded.  During the call, the CS told UM2 that s/he had arrived.  UM2

7  said that he was inside the mall and would come out to meet the CS.

8     22.    At 1:55 p.m., TFO Shaw observed a Hispanic male, who was later

9  identified as GUTIERREZ-PONCE, walk from the entrance of the Tacoma Mall toward

10  the CS's vehicle.  TFO Shaw observed that GUTIERREZ-PONCE was carrying a

11  motorcycle helmet. TFO Shaw and SA Gibb observed the CS exit his/her vehicle, and

12  greet GUTIERREZ-PONCE.  SA Gibb and TFO Shaw took surveillance photographs of

13  GUTIERREZ-PONCE at that time.  Both the CS and GUTIERREZ-PONCE then entered

14  the CS's vehicle.

15     23.    When they entered the vehicle, SA Gibb—who monitored the meeting via a

16  monitoring/recording device—heard the CS and GUTIERREZ-PONCE discussing the

17  quality of methamphetamine.  As instructed by agents prior to the meeting, the CS told

18  GUTIERREZ-PONCE that s/he may be interested in purchasing a pound or more of

19  methamphetamine from GUTIERREZ-PONCE later that day.  GUTIERREZ-PONCE

20  told the CS that he had other business to do in Tacoma, and if the CS wanted to purchase

21  methamphetamine, he (GUTIERREZ-PONCE) could meet the CS in Federal Way later

22  that day.  GUTIERREZ-PONCE mentioned that he could call an associate to bring the

23  methamphetamine to Federal Way for the transaction.

24     24.    At 2:00 p.m., TFO Shaw and SA Gibb observed GUTIERREZ-PONCE exit

25  the CS's vehicle and walk toward a motorcycle that was parked in the mall parking lot.

26  TFO Justin Chohrach observed the license plate of the motorcycle:  Washington

27  9F2142, which is registered to Julian GUTIERREZ-PONCE at an address known to

28  investigators that is located in Seattle, Washington (hereafter, "Target Residence 1").  At

AFFIDAVIT OF SA ERIC RODENBERG – 6
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2:02 p.m., TFO Shaw observed GUTIERREZ-PONCE depart the mall parking lot on the motorcycle.  Surveillance was maintained on the GUTIERREZ-PONCE.

25.    Following the meeting between the CS and GUTIERREZ-PONCE, SA Gibb and Group Supervisor ("GS") Lance Lehnhoff maintained surveillance on the CS and met the CS at a predetermined location.  SA Gibb recovered the recording device from the CS, and the CS handed SA Gibb a clear zip-lock bag that was tied in a knot and contained a small amount of a suspected methamphetamine.  SA Gibb and GS Lehnhoff searched the CS's person and vehicle for contraband, with none found.  Agents preserved the small amount of methamphetamine as evidence, but did not conduct a field test of the substance due to the small amount.

26.    SA Gibb and GS Lehnhoff then interviewed the CS briefly.  The CS stated that GUTIERREZ-PONCE had provided the methamphetamine to the CS after GUTIERREZ-PONCE entered the CS's car.  The CS stated that GUTIERREZ-PONCE had two cell phones, and had provided a phone number to contact him in the future: 424-370-9214.

27.    Meanwhile, agents continued surveillance of GUTIERREZ-PONCE, who traveled north on Interstate 5, then west on Highway 16, before exiting at Union Avenue. Surveillance of GUTIERREZ-PONCE was briefly lost in the area of S. Tyler Street and S. 34th Street in Tacoma, where GUTIERREZ-PONCE conducted several counter-surveillance maneuvers (for example, u-turns and quick direction changes) and eventually traveled to a dead-end street at Jane Russells Way.  At 2:27 p.m., TFO Chohrach observed GUTIERREZ-PONCE exit the dead-end street and depart the area.

28.    At 2:25 p.m., (just prior to GUTIERREZ-PONCE leaving the area of Jane Russells Way) the CS received a text message (while in the presence of SA Gibb and GS Lehnhoff) from the telephone number that GUTIERREZ-PONCE provided to the CS during the meeting:  424-370-9214.  The message read, "I'm going up there let me know buddy."  The CS immediately placed two outgoing calls to 424-370-9214, which both went unanswered.

AFFIDAVIT OF SA ERIC RODENBERG – 7
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

29.     Surveillance was maintained on GUTIERREZ-PONCE as he traveled north on S. Union Avenue, where he pulled over to the side of the road and parked in an alley. Agents observed that GUTIERREZ-PONCE appeared to be watching traffic and talking via a bluetooth device on his motorcycle helmet.

30.     At 2:31 p.m., the CS received an incoming call from 424-370-9214, which SA Gibb monitored and recorded.  SA Gibb listened to the call via speakerphone, and heard the CS talking in Spanish with GUTIERREZ-PONCE.  During the call, the CS and GUTIERREZ-PONCE agreed to meet in Federal Way.  GUTIERREZ-PONCE said that he would go to Federal Way, and that he would call his friend.  The CS then asked GUTIERREZ-PONCE about the price for methamphetamine.  GUTIERREZ-PONCE stated that he understood that the price had already been agreed upon.  The CS told GUTIERREZ-PONCE, "twenty-one," and GUTIERREZ-PONCE replied "yes."

31.     At 2:34 p.m., GUTIERREZ-PONCE called the CS back from 424-370-9214.  SA Gibb monitored and recorded the call.  During the call, GUTIERREZ-PONCE asked the CS how many "hours" the CS wanted.  Based upon my training and experience, I know that, in this context, "hours" refers to pounds of methamphetamine.  The CS replied that s/he just wanted one.  GUTIERREZ-PONCE told the CS that he would "let the guy know," and that "they are leaving right now."

32.     At 2:36 p.m., TFO Chohrach observed GUTIERREZ-PONCE drive out of the alley.  Surveillance was maintained on GUTIERREZ-PONCE as he traveled north on Interstate 5 and exited at S. 320th Street, where he traveled west and entered the parking lot of the Commons shopping mall, located at 1928 S. Commons, Federal Way, Washington.  Agents maintained intermittent surveillance of GUTIERREZ-PONCE as he drove around the mall parking lot.  During this surveillance, agents became concerned that GUTIERREZ-PONCE had detected surveillance units.

33.     At 2:50 p.m., SA Gibb and GS Lehnhoff met with the CS at a predetermined location near the Commons shopping mall.  SA Gibb and  GS Lehnhoff again searched the CS's person and vehicle for contraband, with none found.  SA Gibb

AFFIDAVIT OF SA ERIC RODENBERG – 8
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  outfitted the CS with an audio/video recording/transmitting device.  SA Gibb provided

2  the CS with $2,100 in pre-recorded Task Force buy funds.

3    34.    At 2:55 p.m., SA Scott Modesitt observed GUTIERREZ-PONCE exit the

4  mall parking lot traveling east on S. 320th Street.  After GUTIERREZ-PONCE entered

5  an adjacent parking lot and immediately looped around to exit, surveillance was

6  terminated due to concern that GUTIERREZ-PONCE had detected surveillance.

7    35.    At 3:06 p.m., at the direction of SA Gibb and GS Lehnhoff, the CS drove to

8  and parked in the parking lot of the Commons shopping mall.  Constant surveillance was

9  maintained on the CS during the operation.  The CS parked in a parking spot on the north

10  end of the parking lot.

11    36.    At 3:14 and 3:16 p.m., the CS called placed outgoing calls to 424-370-

12  9214.  Both calls went unanswered.  At 3:18 p.m., the CS sent GUTIERREZ-PONCE a

13  text message (to 424-370-9214).  The message read, "What's up listen now I'm here

14  where we agreed."  At 3:19 p.m., the CS received a text message from GUTIERREZ-

15  PONCE that read, "Ok give me a chance now almost."  The CS replied at 3:19 p.m., "Ok

16  don't take too long please because I have other things to do and now you can see the

17  fucking traffic."  At 3:21 p.m., GUTIERREZ-PONCE (424-370-9214) replied, "Yes I'll

18  see you right away buddy."

19    37.    At 3:29 p.m., the CS received a call from GUTIERREZ-PONCE (424-370-

20  9214), which SA Gibb remotely monitored and recorded.  During the call, GUTIERREZ-

21  PONCE made statements indicating that he was concerned that he was being followed

22  and therefore wanted to change the meeting location.  GUTIERREZ-PONCE told the CS

23  to follow him when GUTIERREZ-PONCE arrived.  GUTIERREZ-PONCE told the CS

24  that he had seen some trucks that he did not like, and he asked if the CS had seen

25  them.  The CS told GUTIERREZ-PONCE where s/he was parked.  After this call, SA

26  Gibb instructed the CS to move to a parking spot on the east end of the parking lot.

27    38.    At 3:36 p.m., TFO William Earick observed GUTIERREZ-PONCE enter

28  the shopping mall parking lot on the motorcycle.  Surveillance was maintained on

AFFIDAVIT OF SA ERIC RODENBERG – 9
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  GUTIERREZ-PONCE, who drove around the parking lot for several minutes, then

2  parked in north end of the parking lot, and was observed talking on a cell phone by TFO

3  Earick.

4      39.     At 3:37 p.m., the CS sent a text message to GUTIERREZ-PONCE (424-

5  370-9214) which read, "Send me the location where you want me to see you I left to take

6  a turn to see what I can see."  At 3:40 p.m., the CS received a call from GUTIERREZ-

7  PONCE (424-370-9214), which SA Gibb remotely monitored and recorded.  During the

8  call, the CS told GUTIERREZ-PONCE where s/he had moved to in the parking lot.

9      40.     At 3:41 p.m., TFO Earick observed GUTIERREZ-PONCE drive east

10 through the parking lot and park near the CS.  GS Lehnhoff observed the CS talking to

11 GUTIERREZ-PONCE, who remained seated on his motorcycle.  At 3:44 p.m., GS

12 Lehnhoff observed GUTIERREZ-PONCE put on his helmet and drive out of the parking

13 lot. The CS then entered his/her vehicle.  The CS then informed SA Gibb that

14 GUTIERREZ-PONCE had told him/her to meet across the street at the Harbor Freight

15 Tools store at 31858 Pacific Highway S., Federal Way, Washington.  Surveillance was

16 subsequently established at that location.

17     41.     At the direction of agents, the CS drove directly to the Harbor Freight

18 location and parked in the parking lot.  At 3:57 p.m., SA Gibb observed GUTIERREZ-

19 PONCE on the motorcycle, which was parked in the southwest corner of the parking lot.

20 SA Gibb observed that GUTIERREZ-PONCE was overlooking the parking lot.

21     42.     At 3:59 p.m., the CS called GUTIERREZ-PONCE (424-370-9214). SA

22 Gibb remotely monitored and recorded the call.  During the call, GUTIERREZ-PONCE

23 said he was in the corner of the parking lot.  The CS responded that s/he was down

24 below.  GUTIERREZ-PONCE told the CS that he would tell the guy where the CS was

25 located.

26     43.     At 4:01 p.m., SA Gibb (via the recording/monitoring equipment) heard the

27 CS enter a vehicle and speak in Spanish with a male.  At that time, GS Lehnhoff, who

28 had primary visual surveillance on the CS's vehicle, had his view blocked by traffic and

1  did not see the CS exit his/her vehicle, and could not tell what vehicle the CS had

2  entered.

3      44.    SA Gibb heard (via the recording/monitoring equipment) that the CS and

4  the male were conducting a drug transaction.  Specifically, SA Gibb heard the male ask

5  the CS, "How much is it?"  The CS answered "21."  The CS then asked, "Is it weighed

6  right?" and the male answered, "Yes."  At that time, GS Lehnhoff observed a small white

7  hatchback parked near the CS's vehicle.  About one minute later, SA Gibb observed

8  GUTIERREZ-PONCE drive the motorcycle towards where the CS was parked.  SA

9  Modesitt observed GUTIERREZ-PONCE continue through the parking lot and exit

10  westbound on S. 320th Street.

11      45.    At 4:03 p.m., SA Gibb heard the CS exiting the vehicle.  At 4:03 p.m., GS

12  Lehnhoff observed the white hatchback backing up and departing the area.  Agents

13  attempted to follow the hatchback but were unable to locate it due to heavy traffic on

14  Pacific Highway S.

15      46.    Following the meeting between the CS and the male in the white

16  hatchback, SA Gibb, TFO Shaw, and TFO Sean Scott maintained surveillance on the CS

17  and met the CS at a predetermined location.  SA Gibb recovered the recording device

18  from the CS, and the CS handed SA Gibb a white plastic bag that contained a clear

19  plastic heat-seal bag, which contained suspected methamphetamine.  SA Gibb and TFO

20  Shaw searched the CS's person and vehicle for contraband, with none found.  A field test

21  of the suspected methamphetamine resulted presumptive positive for methamphetamine.

22  The gross weight of the suspected methamphetamine (including the bag it was in) was

23  approximately one pound (or 453 grams).

24      47.    SA Gibb and TFO Shaw then interviewed the CS briefly.  The CS stated

25  that when s/he parked in the Harbor Freight parking lot, s/he called GUTIERREZ-

26  PONCE and told him where s/he had parked.  GUTIERREZ-PONCE stated words to the

27  effect that his associate would come over to the CS.  The CS then saw the white

28  hatchback park near the CS.  The male driver of the hatchback motioned to the CS to

AFFIDAVIT OF SA ERIC RODENBERG – 11
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   enter the hatchback, at which time the CS exited his/her vehicle and entered the

2   hatchback.  The CS observed that the driver was a heavyset Hispanic male.  The

3   CS noticed that there were a lot of personal items on the floorboard of the hatchback as

4   s/he entered.  The male mentioned that it was his "girl's" car.  As the CS entered, the

5   male had the white bag containing methamphetamine in his lap, which he handed to the

6   CS.  The CS opened the bag and looked at the methamphetamine, then handed the male

7   $2,100 of Task Force official funds.  The male counted the money, then told the CS that

8   everything was good.  The CS then exited the hatchback, which drove away.

9        48.     On November 5, 2019, SA Gibb reviewed the audio/video recordings and

10  surveillance photographs from the sample meeting and the controlled purchase the

11  previous day.  SA Gibb also obtained a Washington Department of Licensing

12  ("DOL") photograph of GUTIERREZ-PONCE, based on the registered owner

13  information associated with the license plate of the motorcycle.  SA Gibb observed that

14  the person in the DOL photograph was the same person (GUTIERREZ-PONCE) as the

15  person in the surveillance photographs and video recording that the CS met at the

16  Tacoma mall.  On the same date, SA Gibb showed the DOL photograph to the CS, who

17  positively identified GUTIERREZ-PONCE as the person who provided the

18  methamphetamine sample and arranged for the delivery of the one pound of

19  methamphetamine.

20        49.     Additionally, on November 5, 2019, SA Gibb reviewed the audio/video

21  recording of the controlled purchase of one pound of methamphetamine that the CS

22  conducted with the heavy-set Hispanic male at the Harbor Freight parking lot.  SA Gibb

23  observed that the video recording did not capture a full view of the male's face.  SA Gibb

24  observed that the video briefly captured part of the male's face, including his hairline and

25  right eye.  SA Gibb recognized this image as similar to that of a suspect in another drug

26  trafficking investigation, Juan Jose VEGA-FLORES.  On the same date, SA Gibb

27  obtained a Washington DOL photograph of VEGA-FLORES and showed it to the CS,

28

AFFIDAVIT OF SA ERIC RODENBERG – 12
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  who positively identified VEGA-FLORES as the male who sold him/her one pound of

2  methamphetamine at the Harbor Freight parking lot the previous day.

3       50.    Following this first controlled purchase, a DEA analyst performed a

4  telephone toll analysis for 424-370-9214, the phone used by GUTIERREZ-PONCE to

5  arrange the transaction with the CS.  Telephone toll analysis was completed in order to

6  identify a phone that VEGA-FLORES used to communicate with GUTIERREZ-PONCE.

7  Agents believe that GUTIERREZ-PONCE contacted VEGA-FLORES by phone to

8  arrange for him to deliver the methamphetamine to the CS, because:  (1) GUTIERREZ-

9  PONCE told the CS that he would call his friend to deliver the methamphetamine to

10 Federal Way, and (2) agents did not observe GUTIERREZ-PONCE meet with VEGA-

11 FLORES in person before the transaction.  Knowing the time frame of the controlled

12 purchase, the analyst was able to determine that 206-227-2871 is the phone most likely

13 used by VEGA-FLORES to communicate with GUTIERREZ-PONCE to coordinate the

14 delivery of methamphetamine.  A search of law enforcement databases also revealed that

15 206-227-2871 was identified in another DEA investigation as being a phone that is

16 utilized by VEGA-FLORES.

17 **C. Identification of the Residences of GUTIERREZ-PONCE and VEGA-**

18    **FLORES**

19      51.    On November 8, 2019, Pierce County Superior Court Judge Grant Blinn

20 signed an order authorizing real-time GPS location information for the telephone used by

21 GUTIERREZ-PONCE during the controlled purchase on November 4, 2019: 424-370-

22 9214.  Agents served the order on the telephone provider on the same date and began to

23 receive location data for the telephone.  Location data for the device showed that it was

24 located overnight throughout the month of November 2019 at an address (Target

25 Residence 1), which coincides with a motorcycle registered to GUTIERREZ-PONCE at

26 that address.

27      52.    On November 18, 2019, agents received information from the Port of

28 Seattle Police Department ("PSPD") regarding VEGA-FLORES.  According to the

AFFIDAVIT OF SA ERIC RODENBERG – 13
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

PSPD's investigation, on October 4, 2019, VEGA-FLORES was involved in a car accident in the 16000 block of Air Cargo Road, in SeaTac, Washington. VEGA-FLORES had apparently rear-ended another vehicle. Further investigation revealed that VEGA-FLORES was driving a vehicle that was displaying a stolen license plate. During a search of VEGA-FLORES's vehicle, PSPD officers recovered a stolen Smith and Wesson M&P 380 pistol. Following the accident, VEGA-FLORES provided his residence address, located in Burien, Washington (hereafter, "Target Residence 2"), to PSPD officers, which matches the address associated with VEGA-FLORES according to DOL records.

**D. Controlled Purchase of Methamphetamine in December 2019**

53.    Following the above-described controlled purchase on November 4, 2019, the CS had several telephone calls with GUTIERREZ-PONCE regarding future drug transactions, which occurred over the span of several weeks. SA Gibb remotely monitored and recorded the calls. During one of the calls, GUTIERREZ-PONCE told the CS that GUTIERREZ-PONCE was lowering the price per pound of methamphetamine, from $2,100 to $1,900.

54.    Additionally, on November 20, 2019, the CS received a call from GUTIERREZ-PONCE, who was calling from 562-884-5338. During the call, GUTIERREZ-PONCE told the CS that 562-884-5338 was his new telephone number. On December 2, 2019, Pierce County Superior Court Judge Orlando signed an order authorizing real time GPS location information for 562-884-5338. Agents served the order on the telephone provider on the same date and began to receive location data for the telephone on December 3, 2019. Location data for the telephone showed that it was located overnight at Target Residence 1, throughout the months of December 2019 and January 2020.

55.    On December 3, 2019, agents conducted another controlled purchase of methamphetamine from GUTIERREZ-PONCE, utilizing the CS. At 1:54 p.m., agents established surveillance at Target Residence 1. When surveillance was established, TFO

AFFIDAVIT OF SA ERIC RODENBERG – 14
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Earick observed a blue 1998 Mazda B4000 pickup, Washington license C80981M

2  (Target Vehicle 1) (registered to Vallarta's Landscaping, at Target Residence 1).

3      56.    At 1:55 p.m., SA Gibb and TFO Scott met with the CS at a predetermined

4  location.  SA Gibb and TFO Scott searched the CS's person and vehicle for contraband,

5  with none found.  SA Gibb outfitted the CS with an audio/video recording/transmitting

6  device.  SA Gibb provided the CS with $1,900 of DEA Official Advanced Funds

7  ("OAF") for the controlled purchase.

8      57.    At 2:03 p.m., the CS placed a monitored/recorded call to GUTIERREZ-

9  PONCE at 562-884-5338.  During the call, the CS requested (in coded language) to

10  purchase methamphetamine from GUTIERREZ-PONCE and requested to meet him in

11  about 30 minutes.  GUTIERREZ-PONCE agreed to the transaction but told the CS that

12  he could not meet that soon, because GUTIERREZ-PONCE was watching his child and

13  waiting for his wife to arrive.  GUTIERREZ-PONCE mentioned that his wife had go to

14  "the security."  GUTIERREZ-PONCE told the CS that he would advise the CS when he

15  would be available.  The CS told GUTIERREZ-PONCE that he needed "the same as last

16  time," meaning one pound of methamphetamine.  The CS told GUTIERREZ-PONCE

17  that he wanted large pieces or crystals of methamphetamine, as opposed to powdery,

18  smaller crystals.  GUTIERREZ-PONCE agreed.

19      58.    Meanwhile, at 1:58 p.m., TFO Chohrach established surveillance at Target

20  Residence 2, the residence of VEGA-FLORES.  At that time, TFO Chohrach observed a

21  white Ford hatchback, Washington license BNX1305 (registered to Alma P Gil Gonzalez

22  at Target Residence 2) parked in the parking lot of the apartment building.  This car is the

23  same make and appearance of a car driven by VEGA-FLORES on November 4, 2019

24  when he delivered the CS one pound of methamphetamine.  TFO Chohrach observed two

25  Hispanic males near the Ford hatchback.  The males were working on an SUV that was

26  also parked in the parking lot.  TFO Chohrach could not determine from his surveillance

27  position whether or not either of the males was VEGA-FLORES.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

59.     At 2:15 p.m., the CS received an incoming call from GUTIERREZ-PONCE (562-884-5338), which was monitored and recorded by agents.  During the call, GUTIERREZ-PONCE told the CS that he found someone that could take care of the child, so he would be able to meet the CS soon at the Southcenter Mall.

60.     At 2:21 p.m., TFO Earick observed a Hispanic male matching the description of GUTIERREZ-PONCE walk from Target Residence 1, carrying a small child, which he placed in the rear seat of an Acura sedan (Washington license BDV3248). TFO Earick observed GUTIERREZ-PONCE enter the driver's seat of the Acura and depart the area.  Surveillance was maintained on the Acura as it traveled to a Shell gas station located at 9525 14th Avenue S., Seattle, and parked near the gas pumps.  GS Lehnhoff observed GUTIERREZ-PONCE enter the gas station briefly then return to the Acura and drive out of the area.

61.     Surveillance was maintained on the Acura as it traveled to the Social Security Office located at 151 SW 156th Street, Burien, Washington, where it stopped in the parking lot for several minutes.  TFO Ryan Hamilton observed that the Acura was parked in the parking lot with the "hazard" flashers activated, but agents were not in a position to see what GUTIERREZ-PONCE did while in the parking lot.

62.     At 2:44 p.m., TFO Hamilton observed the Acura depart the parking lot of the Social Security office, traveling eastbound.  Surveillance was maintained on the Acura for a short distance, at which time surveillance was lost.  Agents then moved to establish surveillance at the Southcenter Mall.

63.     At 2:54 p.m., the CS placed a monitored/recorded call to GUTIERREZ-PONCE (562-884-5338).  During the call GUTIERREZ-PONCE told the CS that he would arrive in 10-15 minutes, and that GUTIERREZ-PONCE needed to make sure the product was good (i.e., larger crystals as the CS requested).

64.     At 3:07 p.m., at the direction of SA Gibb and TFO Scott, the CS drove to and parked in the parking lot of the Buffalo Wild Wings restaurant, located at the north

AFFIDAVIT OF SA ERIC RODENBERG – 16
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 end of the Southcenter Mall, at 2800 Southcenter Mall, Seattle, Washington.  Constant
2 surveillance was maintained on the CS during the operation.

3      65.    At 3:12 p.m., the CS called with GUTIERREZ-PONCE (562-884-5338),
4 who stated that he was finishing up and would meet the CS at the Buffalo Wild Wings
5 restaurant in 10 minutes.  At 3:27 p.m., SA Gibb heard, via the transmitting device, that
6 the CS was talking on the phone with GUTIERREZ-PONCE and directing him to where
7 the CS was parked.  SA Gibb then observed Target Vehicle 1 arrive and park next to the
8 CS's vehicle.  This is the same truck that was parked at the Target Residence 1
9 previously in the day, indicating that GUTIERREZ-PONCE had returned to Target
10 Residence 1 after he went to the Social Security office in Burien and before meeting with
11 the CS.

12      66.    SA Gibb observed GUTIERREZ-PONCE exit Target Vehicle 1 and enter
13 the front passenger seat of the CS's vehicle, at which time SA Gibb heard (via the
14 transmitting device) GUTIERREZ-PONCE conduct a drug transaction with the CS.
15 Moreover, SA Gibb observed GUTIERREZ-PONCE hand the CS a package containing a
16 crystal substance that SA Gibb recognized, based on his training and experience, to be
17 methamphetamine.  While looking at the package, the CS commented to GUTIERREZ-
18 PONCE, "This looks better."  At 3:30 p.m., SA Gibb observed GUTIERREZ-PONCE
19 exit the CS's vehicle, enter the driver's seat of Target Vehicle 1, and drive out of the area.
20 Surveillance was maintained on Target Vehicle 1 as it traveled south on Southcenter
21 Parkway, west on S. 200th Street, and north on Military Road, at which point surveillance
22 was lost.

23      67.    TFO Earick subsequently established surveillance at Target Residence 1,
24 and observed that Target Vehicle 1 had not returned to the residence.  Surveillance was
25 subsequently terminated.

26      68.    Meanwhile, SA Gibb and TFO Scott maintained constant surveillance on
27 the CS and met the CS at a predetermined location.  The CS provided agents a red gift
28 bag, which contained a clear zip lock bag that contained suspected methamphetamine.

AFFIDAVIT OF SA ERIC RODENBERG – 17
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Agents searched the CS's person and vehicle for contraband, with none found.  SA Gibb

2 recovered the recording device from the CS.  Agents conducted a field test of the

3 suspected methamphetamine, which returned presumptive positive for methamphetamine.

4 The gross weight of the suspected methamphetamine (including the bag it was in) was

5 approximately one pound (or approximately 453 grams).

6 **E. Controlled Purchase of "M-30" Pills on January 30, 2020**

7 69.     Following the controlled purchase on December 3, 2019, the CS had

8 several telephone calls with GUTIERREZ-PONCE, which occurred over the span of

9 several weeks, regarding future drug transactions.  SA Gibb monitored and recorded the

10 calls remotely.  During these communications, GUTIERREZ-PONCE told the CS, in

11 coded language, that he had "pills" available.  The CS believed that GUTIERREZ-

12 PONCE was referring to counterfeit "M-30" pills containing fentanyl.

13 70.     On January 20, 2020, GUTIERREZ-PONCE called the CS from a new

14 telephone number:  562-618-3863.  During the call, GUTIERREZ-PONCE identified

15 562-618-3863 as his new telephone number and told the CS to call GUTIERREZ-

16 PONCE for whatever s/he needed (referring to drugs).  On January 28, 2020, Pierce

17 County Superior Court Judge Orlando signed an order authorizing real time GPS location

18 information for 562-618-3863.  Agents served the order on the telephone provider and

19 began to receive location data for the telephone on the same date.

20 71.     On January 30, 2020 at 1:20 p.m., agents began to attempt to locate

21 GUTIERREZ-PONCE, based on GPS location data for his telephone (562-618-3863), in

22 anticipation of a controlled purchase of fentanyl pills.  At 1:45 p.m., GPS location data

23 showed that GUTIERREZ-PONCE's telephone was located in the vicinity of Kent,

24 Washington.

25 72.     At 2:00 p.m., agents also established surveillance at Target Residence 1.  At

26 2:04 p.m., TFO Chohrach arrived at a 7-Eleven store located at the intersection of Willis

27 Street and Central Ave in Kent, Washington, which coincided with GPS location data for

28 GUTIERREZ-PONCE's telephone at the time.  At that location, TFO Chohrach observed

AFFIDAVIT OF SA ERIC RODENBERG – 18
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  a silver Mazda sedan that was parked in the parking lot.  TFO Jonathan Pearson observed

2  that a male matching the description of GUTIERREZ-PONCE was sitting in the front

3  passenger seat of the Mazda, while an unidentified male was in the driver's seat.

4      73.    One minute later, TFO Chohrach observed the Mazda drive out of the

5  parking lot.  Agents were unable to maintain surveillance of the Mazda when it left.

6  Agents continued to monitor GPS location data for GUTIERREZ-PONCE's telephone,

7  which showed that the device was moving from the Kent area toward GUTIERREZ-

8  PONCE's residence (Target Residence 1).

9      74.    At 2:07 p.m., SA Gibb and your Affiant met with the CS at a predetermined

10  location.  Agents searched the CS and the CS's vehicle for contraband, with none found.

11  SA Gibb outfitted both the CS and your Affiant (who was acting in an undercover

12  capacity and will be hereafter referred to as "UC") with audio/video

13  recording/transmitting devices.

14      75.    At 2:22 p.m., at the direction of agents, the CS placed a monitored/recorded

15  call to GUTIERREZ-PONCE (562-618-3863).  The call went to voicemail.  At 2:28 p.m.,

16  the CS received an incoming call from GUTIERREZ-PONCE (562-618-3863).  The call

17  occurred in Spanish, and was monitored and recorded by SA Gibb.  During the call, in

18  coded language, the CS asked GUTIERREZ-PONCE if he could bring the CS a sample

19  of pills.  GUTIERREZ-PONCE replied, "right now where they [the pills] are, they don't

20  arrive until like four I believe... let me see if the guy has left yet."  GUTIERREZ-PONCE

21  then confirmed that the CS wanted only "the little round ones," which the CS confirmed.

22  GUTIERREZ-PONCE then stated, "Let me see... I give some to the guys so that they are

23  in the street... let me see if they still have a few so they can give me some to bring to

24  you."  The CS and agents understood this to mean that GUTIERREZ-PONCE's fentanyl

25  pill supplier was not available until 4:00 p.m., but that he would see if he could get a

26  sample from one of his redistributors or "runners" that he had given pills to previously.

27      76.    At 2:34 p.m., the CS received an incoming call from GUTIERREZ-PONCE

28  (562-618-3863).  During the call, which was monitored and recorded, GUTIERREZ-

AFFIDAVIT OF SA ERIC RODENBERG – 19
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  PONCE told the CS that, "it looks like the guy is there."  GUTIERREZ-PONCE then

2  stated that he was changing a headlight and after that he would "go pick them up and

3  head over there."  The CS confirmed that s/he would meet GUTIERREZ-PONCE at the

4  same place that they met last time, (i.e. the Buffalo Wild Wings restaurant at the

5  Southcenter Mall).  GUTIERREZ-PONCE stated that he would arrive in approximately

6  45 minutes.

7         77.    At 2:40 p.m., TFO Earick observed Target Vehicle 1 driving on Des

8  Moines Memorial Drive toward Target Residence 1.  At 2:45 p.m., SA Gibb, who was

9  monitoring a stationary surveillance camera at GUTIERREZ-PONCE's residence,

10 observed Target Vehicle 1 arrive and park in front of Target Residence 1.  SA Gibb also

11 observed a maroon GMC Canyon pickup arrive simultaneously with Target Vehicle 1.

12 The GMC Canyon parked directly behind Target Vehicle 1.  SA Gibb then observed

13 GUTIERREZ-PONCE exit Target Vehicle 1 and enter the front passenger seat of the

14 GMC Canyon.  The GMC Canyon then departed, traveling north from the residence.

15        78.    Agents were unable to maintain surveillance on the GMC Canyon, due to

16 counter-surveillance driving techniques that it performed as it left the residence.  At 2:49

17 p.m., TFO Earick observed the GMC Canyon in the vicinity of the intersection of Eighth

18 Ave. S. and S. Trenton Street.  Agents were again unable to maintain surveillance of the

19 GMC Canyon.

20        79.    At 3:03 p.m., GPS location data for GUTIERREZ-PONCE's telephone

21 showed that the device was located in the vicinity of VEGA-FLORES's residence (Target

22 Residence 2).  The "certainty" of the GPS location was indicated at 24 meters.  After

23 receiving the GPS location data, surveillance team members departed the vicinity of

24 GUTIERREZ-PONCE's residence in an attempt to locate him at VEGA-FLORES's

25 residence.

26        80.    At 3:07 p.m., the CS received an incoming call from GUTIERREZ-PONCE

27 (562-618-3863), which SA Gibb monitored and recorded.  During the call, GUTIERREZ-

28 PONCE told the CS that he would arrive in 10-15 minutes.  At 3:16 p.m., TFO Justin

AFFIDAVIT OF SA ERIC RODENBERG – 20
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Chohrach arrived and established surveillance at Target Residence 2.  TFO Chohrach did

2  not observe the GMC Canyon in the vicinity of the apartment building, indicating that

3  GUTIERREZ-PONCE had already departed to go meet the CS.

4        81.  At 3:17 p.m., at the direction of agents, the CS and UC entered the CS's

5  vehicle and drove (while under constant surveillance) to the Buffalo Wild Wings

6  restaurant located at 2800 Southcenter Mall, Seattle, Washington.  At 3:20 p.m., TFO

7  Antony Nisco observed the GMC Canyon arrive at the restaurant and park directly next

8  to the CS's vehicle on the passenger side.  SA Gibb observed GUTIERREZ-PONCE exit

9  the driver's side of the GMC Canyon and enter the back seat of the CS's vehicle.

10        82.  After entering the vehicle, the UC observed GUTIERREZ-PONCE hand

11  the CS a small latex bag, with a small number of pill shaped items inside.  When

12  GUTIERREZ-PONCE entered the vehicle, the UC could smell a strong vinegar-like odor

13  coming from the area GUTIERREZ-PONCE was sitting, particularly when he reached

14  forward into the front seat area to hand the CS the pills.  Based on the UC's training and

15  experience, this is a known smell associated with heroin.

16        83.  At 3:21 p.m., TFO Nisco observed GUTIERREZ-PONCE exit the CS's

17  vehicle and walk back to the GMC Canyon, where he entered the driver's seat and drove

18  out of the parking lot.  Agents maintained surveillance of the CS and UC as they drove to

19  a predetermined location, where the UC showed SA Gibb the pills, which were stamped

20  "M-30."  SA Gibb and the UC searched the CS and the CS's vehicle for contraband, with

21  none found.  For safety reasons, agents did not conduct a field test of the pills.  Based on

22  my training and experience, and knowledge of the investigation to date, I believe that the

23  pills contained fentanyl, because, for example, their appearance is highly similar to that

24  of pills containing fentanyl that investigators have collected and tested in other

25  investigations.

26        84.  Agents transferred the pills to the DEA Western Regional Laboratory for

27  analysis and safekeeping.

28

AFFIDAVIT OF SA ERIC RODENBERG – 21
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

85.     Agents then interviewed the CS briefly regarding the meeting.  The CS stated that a short time after s/he and the UC arrived at the parking lot, s/he observed GUTIERREZ-PONCE arrive in a maroon pickup truck.  GUTIERREZ-PONCE entered the back of the CS's vehicle, handed the CS a clear plastic bag containing six small blue pills.  The CS told GUTIERREZ-PONCE that the UC had a friend who was interested in buying pills, and that s/he and the UC would go meet the friend to show the sample, and would let GUTIERREZ-PONCE know if they wanted to buy more.  The CS stated that GUTIERREZ-PONCE indicated that he was not comfortable with the UC being present and it would be better if the CS came alone in the future.

86.     At 3:32 p.m., SA Gibb observed (via the stationary surveillance camera) the GMC Canyon arrive at Target Residence 1 and park inside the gate in the driveway at the south side of the residence.  At 3:38 p.m., GPS location data for GUTIERREZ-PONCE's telephone (562-618-3863) showed that the device was located in the vicinity of the Target Residence 1.

87.     At 3:58 p.m., at the direction of agents, the CS placed a monitored/recorded call to GUTIERREZ-PONCE (562-618-3863).  During the call, the CS asked GUTIERREZ-PONCE for "270," referring to 270 pills.  GUTIERREZ-PONCE replied the he would leave in ten minutes to "pick up" and he would meet the CS in approximately 40 minutes.  Following the call, agents provided the CS with $2,500 of OAF to purchase pills from GUTIERREZ-PONCE.

88.     At 4:01 p.m., SA Gibb observed (via the stationary surveillance camera) GUTIERREZ-PONCE and an unidentified male (hereafter "UM3") walk from Target Residence 1 toward Target Vehicle 1.  SA Gibb observed GUTIERREZ-PONCE enter the driver's seat of Target Vehicle 1, while UM3 entered the front passenger seat. Target Vehicle 1 then departed the residence.  At 4:14 p.m., TFO Chohrach observed Target Vehicle 1 arrive at VEGA-FLORES's apartment building (Target Residence 2) and park on the north side of the building.  When Target Vehicle 1 passed TFO Chohrach, he observed that there were two occupants in the vehicle.  Target Vehicle 1 then parked out

AFFIDAVIT OF SA ERIC RODENBERG – 22
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of TFO Chohrach's view.  A minute later, TFO Chohrach drove through the rear parking

2  lot of apartment building and observed Target Vehicle 1 parked up against a fence, not in

3  a parking stall.  TFO Chohrach observed there was only a front-seat passenger in the

4  vehicle and no one in the driver's seat.

5       89.    At 4:16 p.m., at the direction of agents, the CS entered his/her vehicle and

6  drove, while under constant surveillance, back to the Buffalo Wild Wings restaurant

7  parking lot.

8       90.    At 4:22 p.m., TFO Chohrach walked through the parking lot of Target

9  Residence 2.  As he walked by the Target Vehicle 1, TFO Chohrach noted that the front-

10  seat passenger was still the only person in the vehicle.  TFO Chohrach maintained

11  surveillance on Target Vehicle 1.

12       91.    At 4:23 p.m., TFO Chohrach observed a white Ford Focus, bearing

13  Washington license plate BNX1305, arrive at the apartment building and park in a

14  parking stall in the parking lot for Target Residence 2.  This is the same Ford Focus that

15  is associated with VEGA-FLORES (as described above).  TFO Chohrach observed three

16  children exit the passenger side of the Ford Focus, while another male remained seated in

17  the driver's seat.  TFO Chohrach observed that the three subjects that exited the Ford

18  Focus all walked up the stairs on the south side of the apartment building and entered

19  Target Residence 2.

20       92.    At 4:26 p.m., TFO Chohrach observed GUTIERREZ-PONCE exit Target

21  Residence 2 and walk down the stairs.  TFO Chohrach observed that GUTIERREZ-

22  PONCE was talking on a cell phone, and entered the driver's seat of Target Vehicle 1.

23  While GUTIERREZ-PONCE was still sitting in Target Vehicle 1, the CS received a text

24  message from GUTIERREZ-PONCE (562-618-3863) which read, "I'm headed over there

25  dude, it's just that I didn't have them counted out."  Approximately 30 seconds later,

26  TFO Chohrach observed Target Vehicle 1 depart the parking lot of Target Residence 2.

27       93.    At 4:39 p.m., TFO Earick observed Target Vehicle 1 enter the parking lot

28  of the Southcenter Mall, driving toward the Buffalo Wild Wings.  TFO Nisco observed

AFFIDAVIT OF SA ERIC RODENBERG – 23
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Target Vehicle 1 park next to the CS's vehicle on the passenger side.  SA Gibb observed

2  GUTIERREZ-PONCE exit the driver's seat of Target Vehicle 1 and enter the front

3  passenger seat of the CS's vehicle.  SA Gibb then heard (via the recording/transmitting

4  device) the CS conduct a drug transaction with the CS.

5      94.     At 4:42 p.m., SA Gibb observed GUTIERREZ-PONCE exit the CS's

6  vehicle, enter the driver's seat of Target Vehicle 1, and drive out of the parking lot.

7  Surveillance was maintained on Target Vehicle 1, as it traveled north on I-5 and then

8  north SR-599.  Shortly thereafter, agents observed Target Vehicle 1 accelerating rapidly

9  and making several abrupt lane changes, at which point surveillance was terminated.

10 TFO Chohrach maintained surveillance at Target Residence 2 but did not observe

11 GUTIERREZ-PONCE return to that location.

12     95.     Meanwhile, SA Gibb and your Affiant maintained constant surveillance on

13 the CS and met him/her at a predetermined location.  The CS provided agents a clear

14 plastic bag containing blue pills marked "M-30."  Agents searched the CS and the CS's

15 vehicle for contraband, with none found.

16     96.     Agents then interviewed the CS regarding the controlled purchase.  The CS

17 stated that shortly after s/he arrived at the Buffalo Wild Wings, s/he observed

18 GUTIERREZ-PONCE arrive driving a blue pickup truck.  GUTIERREZ-PONCE then

19 entered the CS's vehicle and handed the CS the plastic bag containing the blue pills.  The

20 CS handed GUTIERREZ-PONCE the $2,500 of OAF and watched as he counted it.

21 GUTIERREZ-PONCE stated that he has brought 290 pills.  The CS stated that he had

22 asked for 270, but GUTIERREZ-PONCE was not concerned.  For safety reasons, agents

23 did not conduct a field test of the pills.  Based on my training and experience, and

24 knowledge of the investigation to date, I believe that the pills contained fentanyl,

25 because, for example, their appearance is highly similar to that of pills containing

26 fentanyl that investigators have collected and tested in other investigations.

27 ///

28 ///

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**F.  Attempted Controlled Purchase on February 19, 2020**

97.     On February 13, 2020, the CS met with GUTIERREZ-PONCE to discuss a future purchase of 10 pounds of methamphetamine.  The meeting was recorded and monitored by SA Gibb, utilizing an audio/video recording device.  During the meeting, GUTIERREZ-PONCE agreed to supply 10 pounds of methamphetamine to the CS on February 19, 2020.  On February 18, 2020, the CS called GUTIERREZ-PONCE to confirm the transaction for the following day.  During the call, GUTIERREZ-PONCE told the CS that he would only have five pounds of methamphetamine available.  The CS agreed to purchase the five pounds.

98.     On the morning of February 19, 2020, agents established surveillance at Target Residence 1.  At approximately 8:36 a.m., agents observed GUTIERREZ-PONCE leave Target Residence 1, driving a silver Mercedes sedan.  Agents maintained surveillance of GUTIERREZ-PONCE.

99.     Beginning at approximately 9:00 a.m., the CS had a series of calls with GUTIERREZ-PONCE, and ultimately arranged to meet him at the L.A. Fitness parking lot, located at 350 Baker Blvd, Tukwila, Washington.  The calls were monitored and recorded by SA Gibb.  Agents observed GUTIERREZ-PONCE arrive at the L.A. Fitness a short time later.  However, GUTIERREZ-PONCE did not stop and continued driving out of the parking lot.  GUTIERREZ-PONCE and the CS then spoke by telephone, and GUTIERREZ-PONCE indicated that he had seen vehicles that he did not like (i.e. that he had spotted surveillance personnel).  GUTIERREZ-PONCE then requested that the meeting be moved to a different location.

100.     At the direction of investigators, the CS arranged to meet GUTIERREZ-PONCE at the Holiday Inn Express, located at 90 Andover Park E., Tukwila, Washington.  Agents maintained surveillance of GUTIERREZ-PONCE, and observed him meet with an unidentified male, who was driving a gray Dodge Magnum (i.e., **Target Vehicle 2**).  Both the Mercedes and the Magnum then began to drive toward the Holiday Inn Express.

1       101.   As the two vehicles approached the Holiday Inn Express, agents observed
2   GUTIERREZ-PONCE enter the parking lot and park near the CS.  The Magnum did not
3   enter the hotel parking lot, but instead entered the parking lot of an adjacent business.
4   GUTIERREZ-PONCE was observed by TFO Earick exiting the Mercedes he was driving
5   and entering the front passenger seat of the CS's vehicle.  After entering the vehicle,
6   investigators approached the CS's vehicle, identified themselves, and placed
7   GUTIERREZ-PONCE under arrest.  Agents simultaneously attempted to stop the
8   Magnum, but were unable to do so.  The Magnum (**Target Vehicle 2**) fled the area at a
9   high rate of speed.

10   **G. Search of GUTIERREZ-PONCE's Residence and Vehicle**

11       102.   After taking GUTIERREZ-PONCE into custody, agents executed a federal
12   search warrant at Target Residence 1.  A female and a young child were found inside
13   while serving the warrant.  During the search of the residence, agents located a safe in
14   master bedroom the closet.  Inside the safe, agents located a large amount of U.S.
15   currency and a loaded 9mm semi-automatic handgun.  Inside a second bedroom, agents
16   located a large amount of U.S. currency in the night stand next to the bed.

17       103.   Investigators also executed a federal warrant to search GUTIERREZ-
18   PONCE's blue Mazda B4000 pickup truck (Target Vehicle 1).  The truck was parked in
19   the backyard of the residence.  Investigators searched the vehicle and found several zip
20   lock bags as well as saran wrap in the pickup truck. These items were found in multiple
21   trash bags in the Mazda pickup and are commonly used to package drugs.

22   **H. Search of VEGA-FLORES's Residence**

23       104.   At the same time that the search warrant was executed at Target Residence
24   1, agents also executed a federal search warrant at Target Residence 2.  A female and
25   three small children were found inside the apartment while serving the warrant, however,
26   VEGA-FLORES was not inside at the time of service.

27       105.   During the search, agents found various suspected controlled substances,
28   including approximately 992.5 grams of cocaine and 2,858.2 grams of heroin, both of

AFFIDAVIT OF SA ERIC RODENBERG – 26
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

which field-tested positive.  Agents further found approximately 276.9 grams of suspected fentanyl pills.  Agents did not conduct a field test of the pills, due to the possibility that they contain fentanyl.  Based on my training and experience, and knowledge of the investigation to date, I believe that the pills contained fentanyl, because, for example, their appearance is highly similar to that of pills containing fentanyl that investigators have collected and tested in other investigations.  Investigators also found within Target Residence 2 a loaded 9mm semi-automatic handgun and a large amount of U.S. currency.

**I.  Complaint Filed**

106.   On February 20, 2020, GUTIERREZ-PONCE and VEGA-FLORES were charged by Complaint with one count of Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (W.D. Wash. 2:20mj074). The same day, the Honorable Mary Alice Theiler issued a warrant for VEGA-FLORES's arrest.

**J.  Arrest of VEGA-FLORES on February 27, 2020**

107.   On February 26, 2020, at approximately 11:52 AM, GPS location data from VEGA FLORES's phone indicated that his phone was in the vicinity of 3702 Auburn Way S., Auburn, WA (i.e., the apartment complex where **Target Residence 3** is located). This was from phone number 206-468-9840 which (according to data obtained from T-Mobile), is registered to VEGA FLORES.

108.   On February 27, 2020, at approximately 8:00 AM, law enforcement established surveillance at this location.  GPS location data from VEGA FLORES's indicated that the phone was still located near this apartment complex.

109.   While observing the complex, TFO Pearson observed a dark blue Chevrolet pickup truck in the parking lot of the complex.  Agents had previously identified this truck on February 19, 2020, while executing the above-described federal search warrant at VEGA-FLORES's residence (at the time, the individual who was driving the truck was observed circling VEGA-FLORES's apartment, walking in the vicinity of the apartment,

AFFIDAVIT OF SA ERIC RODENBERG – 27
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and taking photographs of the agents' vehicles).  TFO Pearson (on February 27, 2020),
2  observed an individual drive the truck in front of the "G" building of the complex.

3      110.   At approximately 12:30 PM, while maintaining surveillance of the
4  apartment complex and the truck, SA Gibb located the green Dodge Magnum (i.e.,
5  **Target Vehicle 2**) that had fled from law enforcement on February 19, 2020 (as
6  described above).  **Target Vehicle 2** has white racing stripes on it's rear, making it a
7  distinct vehicle.

8      111.   At approximately 2:18 PM, SA Gibb observed two individuals exit
9  apartment 101 of the G building (i.e, **Target Residence** 3) and enter the dark blue
10 Chevrolet pickup truck.  Agents observed the vehicle as it slowly drove through the
11 parking lot and exited.  The truck drove down west of Auburn Way S. and at
12 approximately 2:23 PM, entered the Arco parking lot, located at 2790 Auburn Way S,
13 Auburn, WA 98002.

14     112.   TFO Pearson, who was sitting at the Shell station next to the Arco,
15 positively identified the truck's passenger as VEGA FLORES.  Agents drove to the Arco
16 gas station and located the truck, which was on the west side of the Arco parking lot, near
17 the tire filling station.  Agents entered the parking lot, identified themselves with visible
18 police patches and emergency lights on vehicles, and placed VEGA FLORES under
19 arrest.

20     113.   At approximately 2:25 PM, your Affiant read VEGA-FLORES his Miranda
21 warnings from a DEA 13 Miranda card.  VEGA FLORES stated that he understood his
22 rights and agreed to answer questions.  VEGA-FLORES then admitted to staying at
23 **Target Residence 3** since he returned to Washington on February 19, 2020.  VEGA-
24 FLORES also explained that the second individual whom agents had observed leaving
25 **Target Residence 3** minutes prior, C.S.,* had previously driven **Target Vehicle 2** from an
26 undisclosed location to the apartment complex where **Target Residence 3** is located.

27     114.   Agents also read C.S. his Miranda warnings, and C.S. stated that he
28 understood his rights and agreed to answer questions.  C.S. acknowledged that he had

*For clarity, this individuals initials are "C.S." but this is not the Confidential Source described elswhere in this
Affidavit.

transported **Target Vehicle 2** in the manner that VEGA-FLORES had explained (as noted above).  C.S. further acknowledged that he lived in **Target Residence 3**, and that VEGA-FLORES had been living in **Target Residence 3** for a couple of days.

### **TACTICS USED BY DRUG TRAFFICKERS**

115.    Based upon my training, experience, and participation in this and other investigations involving drug trafficking, my conversations with other experienced investigators and law enforcement investigators with whom I work, and interviews of individuals who have been involved in the trafficking of methamphetamine, heroin, cocaine and other drugs, I have learned and know the following:

116.    Drug traffickers often use "stash houses" to conceal their illegal activities and contraband.  Such stash houses allow drug traffickers to keep their contraband at a hidden location, where they may not live, thereby making it more difficult for law enforcement and/or competitors to identify these locations where drugs and drug proceeds may be hidden.

117.    It is common for drug traffickers to hide proceeds of illegal drug sales and records of illegal drug transactions in secure locations within their residences, stash houses, storage units, garages, outbuildings and/or vehicles on the property for their ready access and to conceal them from law enforcement authorities.

118.    It is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of businesses, residences, and/or vehicles in the residences, stash houses, storage units, garages, outbuildings and/or vehicles of drug traffickers.  Items of personal property that tend to identify the persons in residence, occupancy, control, or ownership of the premises also include canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, financial papers, rental receipts and property ownership papers, personal and business telephone and address books and telephone toll records, and other personal papers or identification cards in the names of subjects involved in the criminal activity being investigated.

AFFIDAVIT OF SA ERIC RODENBERG – 29
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

119.     Drug traffickers frequently amass large amounts of proceeds, in the form of cash, from the illegal sale of drugs that they attempt to legitimize or "launder." To accomplish this goal, drug traffickers use financial institutions and their attendant services, securities, cashier's checks, safe deposit boxes, money drafts, real estate, shell operations, and business fronts. Persons involved in drug trafficking and/or money laundering keep papers relating to these activities for future reference, including federal and state tax records, loan records, mortgages, deeds, titles, certificates of ownership, records regarding investments and securities, safe deposit box rental records and keys, and photographs. I know from my training and experience that often items of value are concealed by persons involved in large-scale drug trafficking inside of safes, lock boxes, and other secure locations within their residences, outbuildings, and vehicles.

120.     Drug traffickers often place assets in names other than their own to avoid detection by investigative/police agencies, and even though these assets are in the names of other individuals or businesses, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

121.     Drug traffickers often document aspects of their criminal conduct through photographs or videos of themselves, their associates, their property, and their products, including drugs and drug proceeds. Drug traffickers usually maintain these photographs or videos in their possession.

122.     Drug traffickers often maintain large amounts of U.S. currency in order to maintain and finance their ongoing illegal drug trafficking business. Often, drug traffickers from other countries operating in the United States use wire remitters and bulk cash transfers to transfer currency to co-conspirators living in other states or countries.

123.     Drug traffickers commonly have in their possession, on their person, and at their residences and/or in their storage units, firearms and other weapons, which are used to protect and secure their property.

124.     Drug traffickers use mobile electronic devices including cellular telephones and other wireless communication devices to conduct their illegal activities. For

AFFIDAVIT OF SA ERIC RODENBERG – 30
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  example, traffickers of controlled substances commonly maintain records of addresses,

2  vehicles, or telephone numbers that reflect names, addresses, vehicles, and/or telephone

3  numbers of their suppliers, customers and associates in the trafficking organization.  It is

4  common to find drug traffickers keeping such records of said associates in cellular

5  telephones and other electronic devices.  Drug traffickers frequently change their cellular

6  telephone numbers to avoid detection by law enforcement, and it is common for drug

7  traffickers to use more than one cellular telephone at any one time.

8       125.    Drug traffickers use cellular telephones to maintain contact with their

9  suppliers, distributors, and customers.  They prefer cellular telephones because, first, they

10 can be purchased without the location and personal information that landlines require.

11 Second, they can be easily carried to permit the user maximum flexibility in meeting

12 associates, avoiding police surveillance, and traveling to obtain or distribute drugs.

13 Third, they can be passed between members of a drug conspiracy to allow substitution

14 when one member leaves the area temporarily.  Since the use of cellular telephones

15 became widespread, every drug trafficker with which I have interacted has used one or

16 more cellular telephones for his or her drug business.  I also know that it is common for

17 drug traffickers to retain in their possession cellular phones that they previously used, but

18 have deactivated or discontinued using.  Based on my training and experience, the data

19 maintained in a cellular telephone used by a drug trafficker is often evidence of a crime

20 or crimes.  This includes the following:

21       a.    The assigned number to the cellular telephone (known as the mobile

22 directory number or MDN), and the identifying telephone serial number (Electronic

23 Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile

24 Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are

25 important evidence because they reveal the service provider, allow us to obtain subscriber

26 information, and uniquely identify the telephone. This information can be used to obtain

27 toll records, to identify contacts by this telephone with other cellular telephones used by

28

AFFIDAVIT OF SA ERIC RODENBERG – 31
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source.

b. The stored list of recent received calls and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user. Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

c. Stored text messages are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d. Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Pictures also identify associates likely to be members of the drug trafficking organization. Some drug traffickers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs. Also, digital photos often have embedded "geocode" information within them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located

AFFIDAVIT OF SA ERIC RODENBERG – 32
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      e. Stored address records are important evidence because they show the user's

2  close associates and family members, and they contain names and nicknames connected

3  to phone numbers that can be used to identify suspects.

4      126. It is common for drug traffickers to possess drugs, drug paraphernalia, and

5  other items which are associated with the sale and use of controlled substances such as

6  scales, containers, cutting agents, and packaging materials in their residences, stash

7  houses, storage units, garages, outbuildings and/or vehicles on their property.

8      127. Drug traffickers frequently try to conceal their identities by using

9  fraudulent names and identification cards. Once identities have been created or stolen

10  from other citizens, drug traffickers use those identifications to falsify records such as

11  Department of Licensing records and phone records for the purpose of theft of services

12  and to evade detection by law enforcement.

13     128. It is a common practice for drug traffickers to maintain records relating to

14  their drug trafficking activities in their residences, stash houses, storage units, garages,

15  outbuildings and/or vehicles. Because drug traffickers in many instances will "front"

16  (that is, sell on consignment) controlled substances to their associates, or alternatively,

17  will be "fronted" these items from their suppliers, such record keeping is necessary to

18  keep track of amounts paid and owed, and such records will also be maintained close at

19  hand so as to readily ascertain current balances. These records include "pay and owe"

20  records to show balances due for drugs sold in the past (pay) and for payments expected

21  (owe) as to the trafficker's suppliers and distributors, telephone and address listings of

22  clients and suppliers, and records of drug proceeds. These records are commonly kept for

23  an extended period.

24     129. Drug traffickers often maintain books, records, receipts, notes, ledgers,

25  airline tickets, money orders, and other papers relating to the transportation and

26  distribution of controlled substances. These documents whether in physical or electronic

27  form, are maintained where the traffickers have ready access to them. These documents

28  include travel records, receipts, airline tickets, auto rental agreements, invoices, and other

AFFIDAVIT OF SA ERIC RODENBERG – 33
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   memorandum disclosing acquisition of assets and personal or business expenses.  I also

2   know that such records are frequently maintained in drugs traffickers' residences, stash

3   houses, storage units, garages, outbuildings and/or vehicles.

4   **COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

5   130.    As described in Attachment B, this application seeks permission to search

6   for and seize items listed in Attachment B that might be found in **Target Residence 3**

7   and **Target Vehicle 2**, in whatever form they are found.  One form in which evidence,

8   fruits, or instrumentalities might be found is data stored on a computer's hard drive or

9   other digital device[3] or electronic storage media.[4]  Thus, the warrant applied for would

10  authorize the seizure of electronic storage media—specifically, cellular phones—or,

11  potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

12  131.    Through my training and experience, and the information learned during

13  the course of this investigation, I know that individuals who engage in offenses like those

14  described above often keep physical evidence, fruits, and instrumentalities of their crimes

15  inside their residences, including but not limited to, digital devices for storing lists of

16  customers, ledgers of financial transactions, access devices relating to financial accounts

17  (including credit and debit cards), detailed financial records, and cash proceeds.  This is

18  particularly true because, for example, VEGA-FLORES is believed to have been staying

19  at **Target Residence 3** for approximately one week following law enforcement's

20

21

22  [3] "Digital device" includes any device capable of processing and/or storing data in electronic
    form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet

23  computers, computer servers, peripheral input/output devices such as keyboards, printers,
    scanners, plotters, monitors, and drives intended for removable media, related communications

24  devices such as modems, routers and switches, and electronic/digital security devices, wireless
    communication devices such as mobile or cellular telephones and telephone paging devices,

25  personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming

26  devices, global positioning satellite devices (GPS), or portable media players.

27  [4] Electronic Storage media is any physical object upon which electronically stored information
    can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs,

28  and other magnetic or optical media.

AFFIDAVIT OF SA ERIC RODENBERG – 34
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  execution of a search at a residence on February 19, 2020, during which agents recovered
2  suspected controlled substances, currency, and a firearm.

3      132.    I have also learned through training, education, and experience that such
4  evidence, fruits, and instrumentalities are often stored in locked containers, safes, secret
5  compartments, closets, drawers, above or below ceiling and floor tiles, behind false walls,
6  and in other places intended to avoid detection by other people, including law
7  enforcement.

8      133.    Finally, I know that the commission of the offenses detailed herein
9  necessarily requires the use of computers, smart phones, tablets, or other computer
10  devices and storage media for the perpetrator to connect with customers and co-
11  conspirators.  I have learned through training and experience that individuals who engage
12  in the offenses described herein also commonly use such electronic devices to keep track
13  of customers, keep records of illegal transactions and criminal proceeds, and store copies
14  of online chats, emails, and other data.  In such cases, I know that perpetrators often keep
15  such electronic devices inside their homes.  In the case of smart phones, tablets, and
16  laptop computers, perpetrators may also keep such devices on their person, either in their
17  pockets or in containers such as carrying bags, cases, backpacks or protective sleeves.

18      134.    *Probable cause.*  Based upon my review of the evidence gathered in this
19  investigation, my review of data and records, information received from other agents and
20  computer forensic examiners, and my training and experience, I submit that if a digital
21  device or other electronic storage medium is found in **Target Residence 3** or **Target**
22  **Vehicle 2** there is probable cause to believe that evidence, fruits, and instrumentalities of
23  conspiracy to commit drug trafficking, in violation of 21 U.S.C. §§ 841 and 846, will be
24  stored on those digital devices or other electronic storage media, for at least the following
25  reasons:

26      a.    I believe that digital devices or other electronic storage media—
27  specifically, cell phones—were being used to communicate with members of, and in
28  furtherance of, the drug trafficking activities described herein.  For example, as described

AFFIDAVIT OF SA ERIC RODENBERG – 35
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

above, evidence gathered during the course of the investigation indicates that

GUTIERREZ-PONCE and VEGA-FLORES have used cell phones to send and receive

communications reflecting, or otherwise related to, the possession and/or distribution of

controlled substances.

135.    There is, therefore, probable cause to believe that evidence, fruits, and

instrumentalities, of the crimes under investigation exist and will be found on digital

devices or other electronic storage media at **Target Residence 3** or **Target Vehicle 2**, for

at least the following reasons:

a.    Based my knowledge, training, and experience, I know that
computer files or remnants of such files may be recovered months or even years after
they have been downloaded onto a storage medium, deleted, or viewed via the Internet.
Electronic files downloaded to a storage medium can be stored for years at little or no
cost.  Even when files have been deleted, this information can sometimes be recovered
months or years later with forensics tools.  This is because when a person "deletes" a file
on a computer, the data contained in the files does not actually disappear; rather, that data
remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in
free space or slack space—that is, in space on the storage medium that is not currently
being used by an active file—for long periods of time before they are overwritten.  In
addition, a computer's operating system may also keep a record of deleted data in "swap"
or "recovery" files.

c.    Wholly apart from user-generated files, computer storage media—in
particular, computers' internal hard drives—contain electronic evidence of how a
computer has been used, what is has been used for, and who has used it.  To give a few
examples, this forensic evidence can take the form of operating system configurations,
artifacts from operating system or application operation, file system data structures, and
virtual memory "swap" paging files.  Computer users typically do not erase or delete this
evidence, because special software is typically required for that task.  However, it is
technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes
automatically downloaded into a temporary Internet directory or "cache."

e.    Digital storage devices may also be large in capacity, but small in
physical size.  Because those who are in possession of such devices also tend to keep
them on their persons, especially when they may contain evidence of a crime.  Digital

storage devices may be smaller than a postal stamp in size, and thus they may easily be hidden in a person's pocket.

136.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on digital devices found in **Target Residence 3** and **Target Vehicle 2** because:

a.    Data on the digital storage medium or digital devices can provide evidence of a file that was once on the digital storage medium or digital devices but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to further establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g. registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search of "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer activity associated with user accounts and electronic storage media that connected with

AFFIDAVIT OF SA ERIC RODENBERG – 37
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the computer.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit the crime (e.g. Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper content, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing a user's intent.

f.      I know that when an individual uses a computer to conduct cryptocurrency transactions, the individual's computer or digital device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer or digital device is an instrumentality of the

crime because it is used as a means of committing the criminal offense.  The computer or digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer or digital device used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of text discussions about the crime; and other records that indicate the nature of the offense.

137.  *Necessity of seizing or copying entire computers or storage medium*.  In most cases, a thorough search of a premises for information that might be stored on digital storage media or other digital devices often requires the seizure of the digital devices and digital storage media for later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic copy of the digital media's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  *The time required for an examination.*  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  *Technical requirements.*  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

     c.   *Variety of forms of electronic media.*  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

138.   Searching computer systems is a highly technical process that requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is rarely possible to bring to the search site all the necessary technical manuals and specialized equipment necessary to consult with computer personnel who have expertise in the type of computer, operating system, or software application being searched.

139.   The analysis of computer systems and storage media often relies on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively named, erased, compressed, encrypted or password-protected data, while reducing the likelihood of inadvertent or intentional loss or modification of data.  A controlled environment such as a laboratory, is typically required to conduct such an analysis properly.

140.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impracticable to search for data during the execution of the physical search of the premises.  The hard drives commonly included in desktop and laptop computers are capable of storing millions of pages of text.

141.   A search of digital devices for evidence described in Attachment B may require a range of data analysis techniques.  In some cases, agents may recover evidence with carefully targeted searches to locate evidence without requirement of a manual search through unrelated materials that may be commingled with criminal evidence.  Agents may be able to execute a "keyword" search that searches through the files stored in a digital device for special terms that appear only in the materials covered by the warrant.  Or, agents may be able to locate the materials covered by looking for a particular directory or name.  However, in other cases, such techniques may not yield the evidence described in the warrant.  Individuals may mislabel or hide files and directories;

AFFIDAVIT OF SA ERIC RODENBERG – 40
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

encode communications to avoid using keywords; attempt to delete files to evade detection; or take other steps designed to hide information from law enforcement searches for information.

142.    The search procedure of any digital device seized may include the following on-site techniques to seize the evidence authorized in Attachment B:

        a.    On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or co-conspirators.

        b.    On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when and may contain information about encryption, virtual machines, or stenography which will be lost if the computer is powered down.

        c.    On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted in order to preserve unencrypted data that may, if not immediately imaged on-scene become encrypted and accordingly become unavailable for any examination.

143.    *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

144.    VEGA-FLORES is believed to share **Target Residence 3** with a second individual, C.S.  And as further noted above, C.S. is believed to have driven **Target Vehicle 2**.  As a result, it is possible that **Target Residence 3** and **Target Vehicle 2** will contain cell phones that are predominantly used, and perhaps owned, by C.S.  If it is nonetheless determined that that it is possible that the things described in this warrant

AFFIDAVIT OF SA ERIC RODENBERG – 41
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   could be found on any of those cell phones, the warrant applied for would permit the

2   seizure and review of those items as well.

3   **CONCLUSION**

4       145.    Based on the foregoing, I submit that probable cause exists to search

5   **Target Residence 3** and **Target Vehicle 2** for evidence, fruits, and instrumentalities of

6   violations of Title 21, United States Code, Sections 841(a)(1) and 846.

7       146.    This affidavit and the requested warrant are being presented by reliable

8   electronic means, pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3).

9       147.    This Court has jurisdiction to issue the requested warrant because it is "a

10  court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a),

11  (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . .

12  that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

13

14                  DATED February 27, 2020.

15

16

17                  _____

18                  Eric Rodenberg
                    Special Agent
19                  Drug Enforcement Administration

20

21      The above-named agent provided a sworn statement attesting to the truth of the

    contents of the foregoing affidavit by telephone on this _____ day of February, 2020.

22

23

24                  _____

25                  Hon. DAVID W. CHRISTEL
                    United States Magistrate Judge

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ATTACHMENT A-1

### Location to be Searched

3703 Auburn Way S., Apartment G-101, Auburn, Washington, 98092

### (Target Residence 3)

This location is an apartment unit located in the Clearwater Ridge Apartment Complex in Auburn, Washington. The complex is constituted of approximately 20 buildings, with approximately 4 units per building. Target Residence 3 is located on the first level on the far east side of a building that is approximately in the center of the apartment complex. The door to Target Residence 3 is brown in color and has the number "101" posted on the front.

And any cellular phones found therein.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## ATTACHMENT A-2

2

**Vehicle to be Searched**

3

One Green Dodge Magnum with white racing stripes on its back, Washington license
BPB0137, located in the parking lot of the apartment complex located at 3702 Auburn
Way S., Auburn, Washington.

4

5

And any cellular phones found therein.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A-2     -1-
USAO #2020R00153

# ATTACHMENT B

## Items to be Seized

Evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution and possession with intent to distribute controlled substances, and conspiracy to commit these offenses) and occurring in or after January 2019, as follows:

1) Any suspected controlled substances, including, for example, methamphetamine and heroin;

2) Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluting agents such as inositol, vitamin B12, etc.;

3) Drug Transaction Records: Documents such as ledgers, receipts, notes, invoices, and similar items relating to the acquisition, transportation, and distribution of controlled substances;

4) Customer and Supplier Information: Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items;

5) Books, records, receipts, notes, ledgers, and other documents relating to the distribution of controlled substances and communications between members of the conspiracy;

6) Photographs, video tapes, digital cameras, and similar items depicting friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances, and assets derived from the distribution of controlled substances;

7) Financial records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfer records, cashier's checks and receipts, bank account records, passbooks, tax records, safe deposit box keys and records, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;

8) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises and/or vehicle, including

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

9) Identification documents, including passports, visas, alien registration cards, any travel documents, immigration documents, driver's licenses, identification cards, and social security cards;

10) Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rental car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

11) Safes and locked storage containers, and the contents thereof that are otherwise described in this document;

12) Latent prints and identifying material from items at the residences and vehicles;

13) Stored footage from surveillance systems at the locations to be searched which identifies the person(s) in residence, occupancy, control, or ownership of the premises, and suspected buyers or sellers of controlled substances;

14) Documents and other items tending to show the existence of other stored controlled substances, including rental agreements, receipts, keys, notes, and maps specially concerning off-site storage rooms and/or lockers;

15) Weapons and other dangerous items, to include rifles, shotguns, knives, and handguns, as well as ammunition, shell casings, bullets, magazines, cleaning equipment, holsters, gun boxes and cases, trigger locks, gun safes, gun parts and tools, targets, receipts, bills of sale, and body armor;

16) Address books, daily logs, daily telephone diaries, calendars, and appointment books;

17) United States currency, gift cards, cash cards, and records relating to income derived from, or used or intended to be used to facilitate, buying, selling, and/or distributing controlled substances, and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, checkbooks, check registers, securities, precious metals, jewelry, automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of the aforementioned crimes of investigation;

ATTACHMENT B     -2-
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

18)    Cell Phones: Cellular telephones and other communications devices may be seized, and searched for the following items:

a.    Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b.    Stored list of recent received, sent, and missed calls;

c.    Stored contact information;

d.    Stored photographs of controlled substances, currency, firearms or other weapons, controlled substances cultivation, packaging, and/or paraphernalia, evidence of suspected criminal activity, including photographs of documents or other items described above, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs; and

e.    Stored text messages.

THE SEIZURE OF CELL PHONES AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH CELL PHONES CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIMES.

ATTACHMENT B     -3-
USAO #2020R00153

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970